UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| MURRAY ENERGY CORPORATION, | ) | |
| 46226 National Road, | ) | |
| St. Clairsville, Ohio 43950 | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. |
| | ) | |
| UNITED STATES | ) | |
| DEPARTMENT OF THE INTERIOR, | ) | |
| OFFICE OF SURFACE MINING | ) | |
| RECLAMATIONI AND ENFORCEMENT, | ) | |
| 1951 Constitution Avenue NW, | ) | |
| Washington, DC 20240 | ) | |
| | ) | |
| Defendant. | ) | |
| ———————————————— | ) | |

## COMPLAINT

### I. INTRODUCTION

1.    This complaint challenges the Stream Protection Rule ("SPR"), an audacious attempt by the Office of Surface Mining, Reclamation and Enforcement ("OSMRE") of the U.S. Department of the Interior ("DOI"), to effectively ban "longwall" coal mining.  81 Fed. Reg. 93,066 (Dec. 20, 2016) (30 C.F.R. Parts 700, 701, 773, 774, 777, 779, 780, 783, 784, 785, 800, 816, 817, 824, 827).  In addition to being the most common and economically efficient form of underground coal mining, longwall mining is also the most environmentally friendly type of any form of coal mining.  Banning longwall mining will devastate coal communities, result in widespread job losses, and hollow out state and local government budgets that rely on the revenue coal mining brings.  The rule will also devastate Plaintiff Murray Energy Corporation ("Murray Energy"), which is the nation's predominant longwall mining company, by stranding

billions of tons of the company's coal reserves and billions of dollars of the company's capital in violation of the Fifth Amendment to the United States Constitution.

2.      The rule also flatly contradicts the mandates of the Surface Mining Reclamation and Control Act ("SMCRA"), 30 U.S.C. §§ 1201 *et seq.*, the statute OSMRE relies on for authority to issue the SPR.  Far from authorizing an effective blanket ban on longwall mining, Congress adopted SMCRA, in part, because it recognized the desirability of underground mining, particularly longwall mining.  OSMRE has contorted the plain meaning of a number of SMCRA provisions to arrive at its desired result.  But OSMRE cannot untether itself from the rule of law.  The SPR must be overturned.

## II. PARTIES

3.      Plaintiff Murray Energy, headquartered in St. Clairsville, Ohio, is the largest privately owned coal company in the United States and the fifth-largest coal producer in the country.  Murray Energy employs approximately 4,800 people in the mining, processing, transportation, distribution, and sale of coal.  Murray Energy operates eleven active mines at ten mining complexes located in three major coal producing regions in the United States: Northern Appalachia (including mines in Ohio and West Virginia), the Illinois Basin (including mines in Illinois and Kentucky), and the Uintah Basin in Utah.  In 2015, annual production for the mines totaled roughly 55.7 million tons.  Murray Energy owns 2.2 billion tons of proven or probable coal reserves in the United States.  The company additionally owns or controls four coal transloading facilities (where coal is loaded onto barges), two river towing companies with 27 harbor and towing vessels, 519 barges, 11 locomotives, 577 railcars, and four mining equipment manufacturing and fabrication facilities.  This operational flexibility in conjunction with a vast production and reserve base allow Murray Energy to provide electric-utility customers with low-

cost, reliable, and high-quality coal supplies.  Murray Energy is committed to the use of sound science in the regulatory process and is, accordingly, an active participant in administrative rulemaking processes pertaining to and affecting the coal-mining industry.

4.      DOI is a Department of the Executive Branch of the United States Government.

5.      Defendant OSMRE is a bureau within the DOI.

6.      Defendant OSMRE is responsible for enforcing mining laws, either directly or through state-run programs. As part of these responsibilities, OSMRE regulates surface mining and the surface effects of underground mining. In this role, Defendant OSMRE oversees the rulemaking process for promulgating regulations such as the SPR.

## III.  JURISDICTION AND VENUE

7.      Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1331 (federal question), the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 551 *et seq.*, and SMCRA, 30 U.S.C. §§ 1201 *et seq.*  This Court can grant declaratory and injunctive relief under 28 U.S.C. §§ 2201–2202 and 5 U.S.C. §§ 701–706.

8.      An actual, justiciable controversy now exists between Plaintiff and Defendants, and the requested relief is therefore proper under 28 U.S.C. §§ 2201–2202 and 5 U.S.C. § 701– 706.

9.      Venue properly lies in this United States District Court under 28 U.S.C. § 1391 based upon 30 U.S.C. § 1276(a)(1), which provides that "[a]ny action by the Secretary promulgating national rules or regulations including standards pursuant to sections 501, 515, 516, and 523 shall be subject to judicial review in the United States District Court for the District of Columbia Circuit."

10.     The Federal government has waived sovereign immunity in this action pursuant to the APA, 5 U.S.C. § 702.

## IV.  LEGAL FRAMEWORK

### A.  Administrative Procedure Act ("APA")

11.     The APA provides for judicial review of "final agency action" by persons "adversely affected" or "aggrieved" by such action.  5 U.S.C. §§ 702, 704.  A person so affected is entitled to judicial review on the administrative record.

12.     The APA also provides standards applicable when a federal agency proposes and adopts final rules and regulations.  *Id*. §§ 553, 551(4).

13.     Agencies are required to publish notice of proposed rulemaking in the Federal Register, including reference to the legal authority under which the rule is proposed, and "either the terms or substance of the proposed rule or a description of the subjects and issues involved." *Id.* § 553(b).

14.     After notice is provided, the agency is required to allow interested parties an opportunity to comment on the rulemaking, including through submission of written data, views, or arguments.  *Id*. § 553(c).

15.     An agency must meaningfully review and respond to comments submitted by the public on the agency's proposed rules.  5 U.S.C. § 553; *Nat. Res. Def. Council, Inc. v. U.S. EPA*, 859 F.2d 156, 164 (D.C. Cir. 1988).  To meet its burden, the agency must "respond in a reasoned manner to the comments received, explain how the agency resolved any significant problems raised by the comments, and show how that resolution led the agency to the ultimate rule." *Rodway v. U.S. Dep't of Agric.*, 514 F.2d 809, 817 (D.C. Cir. 1975).

16.     Under the APA, a reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).

17.     A reviewing court shall also "hold unlawful and set aside agency action, findings and conclusions found to be . . . without observance of procedure required by law."  5 U.S.C. § 706(2)(D).

**B.  Surface Mining Control and Reclamation Act ("SMCRA")**

18.     SMCRA was enacted in 1977 and serves as the principal statute for regulating coal mining in the United States.  30 U.S.C. §§ 1201 *et seq.*  SMCRA establishes programs for mine permitting, bonding and financial assurance, inspection and enforcement, and reclamation. *Id.* §§ 1253, 1259, 1267–1271, 1281.  SMCRA also establishes performance standards for mining and sets aside certain lands on which mining may not be conducted.  *Id.* §§ 1265–1266, 1281.

19.     SMCRA created OSMRE to administer the law, although OSMRE may delegate regulatory and enforcement authority to States if it determines that the States have developed SMCRA programs that meet federal requirements.  *Id.* §§ 1211, 1253.  All but two States, including all the States in which Murray Energy conducts mining operations, have received OSMRE approval to operate their own SMCRA programs.  These States are said to have "primacy" under SMCRA because they are the primary SMCRA regulators.

20.     Congress enacted SMCRA to provide a balance between the objective of increasing coal production and the need for appropriate environmental safeguards.  Recognizing that the U.S. must embark upon an "expansion of coal mining to meet the Nation's energy needs," *id.* § 1201(d), Congress provided that one of SMCRA's purposes would be to "assure

that the coal supply essential to the Nation's energy requirements, and to its economic and social well-being is provided and strike a balance between protection of the environment . . . and the Nation's need for coal as an essential source of energy," *id.* § 1202(f).

21.     The environmental concerns that led to SMCRA's adoption were predominately impacts caused by surface mining, sometimes referred to as "strip" mining.  Congress recognized the unique importance of underground mining to the Nation's economy, stating:

> the overwhelming percentage of the Nation's coal reserves can only be extracted by underground mining methods, and it is, therefore, essential to the national interest to insure the existence of an expanding and economically healthy underground coal mining industry[.]

*Id.* § 1201(b).  Continuing in this vein, Congress provided that the Act was intended to facilitate "an expanding and economically healthy underground coal mining industry" by making it a purpose of the Act to "encourage the full utilization of coal resources through the . . . application of underground extraction technologies."  *Id.* § 1202(k).

### 1)     *SMCRA Performance Standards*

22.     While SMCRA is principally focused on surface coal mining operations, Section 516 of SMCRA, 30 U.S.C. § 1266, establishes performance standards for the surface effects of underground coal mining operations.  Section 516(b)(1) provides for standards specifically governing subsidence of the surface that underground mining can cause through the removal of large seams of subsurface coal:

> Each permit issued under any approved State or Federal program pursuant to this Act and relating to underground coal mining shall require the operator to –
>
> (1) adopt measures consistent with known technology in order to prevent subsidence causing material damage to the extent technologically and economically feasible, maximize mine

> stability, and maintain the value and reasonably foreseeable use of
> such surface lands, except in those instances where the mining
> technology used requires planned subsidence in a predictable and
> controlled manner . . . .

30 U.S.C. § 1266(b)(1).

23.     As can be seen, Section 516(b)(1) requires underground mine operators to adopt

measures that are technologically and economically feasible but explicitly exempts from this

regulation "those instances where the mining technology used requires planned subsidence in a

predictable and controlled manner . . . ." *Id.* § 1266(b)(1).

### 2)     *Permit Approval Requirements*

24.     One mechanism under SMCRA for regulating the environmental impacts of coal

mining is through the issuance of permits to conduct surface coal mining and reclamation

operations.  30 U.S.C. § 1291(15).

25.     SMCRA provides that:

> No permit or revision application shall be approved unless the
> application affirmatively demonstrates and the regulatory authority
> finds . . . that . . . the proposed operation . . . has been designed to
> prevent material damage to the hydrologic balance outside the
> permit area.

*Id.* § 1260(b)(3).

26.     The term "permit area" is defined as "the area of land indicated on the approved

map submitted by the operator with his application which areas of land shall be covered by the

operator's bond as required by Section 509 . . . ." *Id.* § 1291(17).

27.     The SMCRA permit application provision, Section 507, requires that the map

submitted by the applicant must be one "clearly showing the land to be affected as of the date of

the application [and] the area of land within the permit area upon which the applicant has the

legal right to enter and commence *surface mining operations* . . . ." *Id.* § 1257(b)(9) (emphasis added).

28.    SMCRA defines "surface coal mining operations" as those "activities conducted on the surface of lands in connection with a surface coal mine or[,] subject to the requirements of Section 516[,] surface operations and surface impacts incident to an underground coal mine." *Id.* § 1291(28).

### 3)    *Limits on Rulemaking Authority*

29.    SMCRA Section 201(c)(2) provides that OSMRE may issue regulations only "as may be necessary to carry out the purposes and provisions of this Act." SMCRA Section 304(a) similarly limits OSMRE's authority to prescribe rules and regulations to only those that "may be necessary to carry out [SMCRA's] provisions."

### C.  Clean Water Act ("CWA")

30.    Under the Clean Water Act ("CWA"), the States are required to establish, implement, and periodically revise water quality standards. 33 U.S.C. § 1313(c).

31.    The principal elements of CWA water quality standards are designated uses and water quality criteria. 40 C.F.R. § 131.1(i). "Designated uses" are those uses "specified in water quality standards for each water body or segment whether or not they are being attained." 40 C.F.R. § 131.3(f). "Criteria" are elements of water quality standards, expressed as constituent concentrations or narrative statements, representing the quality of water that supports a particular use. 40 C.F.R. § 131.3(b).

32.    Although States have assigned "designated uses" for their most significant bodies of water, most States rely on a default provision to set minimum designated uses that are applicable to all smaller waters for which there is no specific designation. Each State in which

Murray operates its longwall mines has established such default designated use categories, which at a minimum protect aquatic life use.

**D.  The Fifth Amendment to the United States Constitution**

33.    The Fifth Amendment to the United States Constitution provides that no person shall be "deprived of life, liberty, or property without due process of law; nor shall private property be taken for public use, without just compensation."  U.S. Const. amend. V.

## V.  PROCEDURAL AND FACTUAL BACKGROUND

**A.  Longwall Mining and Subsidence**

34.    Underground coal mines in the United States are typically operated using one of two different methods:  room-and-pillar mining or longwall mining.  Longwall and room-and-pillar mining are fundamentally different underground mining techniques that are suited to mining different kinds of coal reserves.  As a result, one form of mining generally does not substitute for the other.

### 1)  Overview of Underground Mining Techniques

35.    Room-and-pillar mining is initiated by excavating tunnels or entries to access underground coal deposits.  "Rooms" are then cut into the coal bed, leaving a series of pillars, or columns of coal, in place to support the mine roof.  The underground openings are approximately 20-feet wide and, as mining advances, form a grid-like pattern of entries, rooms, and pillars. Mining equipment is used to mine coal in these rooms from coal seams or "panels." Shuttle cars, conveyor units, and/or conveyor belts are used to transport the coal to the surface.

36.    Longwall mining also involves the excavation of tunnels by room-and-pillar mining to set up long panels.  Once a panel is created through room-and-pillar mining, the longwall is created across the "face" or area of the coal seam to be mined and the large longwall

mining machine is deployed.   Unlike room-and-pillar mining, the mine ceiling behind the longwall is not supported by pillars of coal, but rather by hydraulic roof supports.   A longwall machine with a giant shearer cuts across the coal seam, cutting thin slices of coal, which then fall to a conveyor that takes the coal to be crushed and transported to the surface.   As the shearer advances further into the coal seam, the roof supports in the mined area are advanced, and the roof in the mined-out area is allowed to collapse behind the supports.   In 2015, longwall mining accounted for approximately 57 percent of U.S. underground coal production, equaling 181.6 tons of coal.

### 2)   *Differences between Room-and-Pillar and Longwall Mining*

37.    Room-and-pillar mining is the least efficient of the two underground mining techniques, and is generally used to mine smaller coal blocks or thin seams of coal.  The room-and-pillar technique is impractical for coal below 1,500 feet in depth, since the pillars may not provide adequate support at greater depths.  The technique generally yields coal recovery rates of between 35 to 70 percent.

38.    The longwall system is used to mine through coal panels ranging from 800 to 1,500 feet wide, 4,000 to 16,000 feet long, and 4 to 17 feet thick.  To do so, longwall mining utilizes mining equipment of a much greater scale than utilized for room-and-pillar mining.  Due to the high capital costs of longwall equipment, the technique is not practical for reserves of less than 50 million tons.  Preferred conditions for longwall mining are reserves of 100 million tons or greater, and coal seams that are six feet or greater in thickness and of a sufficiently regular shape to accommodate mining in long rectangular panels.

39.    Longwall mining is the more efficient technique, enabling the removal of almost all the coal in a coal block.  It is also more efficient given the greater economies of scale

involved in longwall mining and the lower overall costs for roof support, rock dusting (for fire suppression), and ventilation.

### 3)   *Subsidence Due to Underground Mining*

40.      Both longwall mining and room-and-pillar mining can create surface subsidence. Subsidence caused by longwall mining is generally uniform and more predictable than subsidence resulting from room-and-pillar mining.  This is due to the longwall mining technique of utilizing planned roof collapse in the mined areas: as the coal panel is mined out, the roof collapses to form a caved area called a gob.  The overlying strata settles, resulting in subsidence on the surface.  Subsidence due to longwall mining generally occurs in a relatively short duration of time, as it follows the forward movement of the longwall machine through the panel.  By contrast, room-and-pillar mining does not involve planned or predictable subsidence; the supporting pillars deteriorate at different rates and collapse over time, making subsidence difficult to predict.

41.      The amount and type of subsidence depends on a variety of factors, such as time, depth of mining, thickness of the coalbed extracted, thickness and strength of the overlying rock, and terrain.   Mine planning can take these factors into account in order to anticipate and minimize subsidence damage to critical areas.  Additionally, for longwall mining, the boundary between areas of subsidence and no subsidence, known as the "angle of draw," can be predicted and planned for.  Typically, maximum subsidence occurs over the center of the mined-out panel, and subsidence diminishes toward the perimeter.

42.      Because subsidence caused by longwall mining is planned for, predictable and controlled, Congress understood that this form of underground mining would qualify for the exemption provided for in Section 516(b)(1), 30 U.S.C. § 1266(b)(1), from otherwise applicable

subsidence regulation.  *See, e.g.*, H.R. Rep. No. 94-45, at 116 (Mar, 6, 1975) ("This specifically allows for the use of longwall and other mining techniques which completely remove the coal."); H.R. Rep. No. 94-896, at 74 (Mar. 12, 1976) (same); Rep. No. 95-128, at  84 (May 10, 1977) ("Thus, operators may use underground mining techniques, such as long-wall mining, which completely extracts the coal and which result in predictable and controllable subsidence.").

### 4)      *Subsidence Impacts on Streams*

43.     As described above, there is a potential for the ground surface to subside when coal is extracted underground.  Subsidence-induced cracks or surface depressions caused by underground mining can lead to the potential alteration of local hydrology.

44.     Potential impacts to surface water from underground mining include loss of streamflow through fractures in the stream bed, and loss of groundwater recharge and water supply from springs and seeps due to the groundwater table dropping below stream bed level. The majority of hydrologic impacts from subsidence are temporary in nature, since groundwater levels and stream flow volumes typically return to pre-mining levels after a few months to a few years.

45.     Existing SMCRA programs regulate subsidence impacts from underground mining through requirements for mine planning as part of the permit application process.  If hydrologic subsidence impacts do occur, the mine operator can employ strategies—such as flow augmentation, grouting of stream beds, and other measures—to address those impacts as part of the reclamation process.

### B.  Procedural Development of the Stream Protection Rule

46.     The SPR is the most recent chapter in a decades-long, controversial rulemaking process concerning surface mining impacts and, in particular, impacts caused by the surface

mining technique used in Appalachia known as "mountaintop removal" or "mountaintop mining." The rulemaking process that ultimately led to OSMRE's final SPR began in 1983, when OSMRE issued the predecessor to the SPR, the Stream Buffer Zone Rule (the "1983 SBZ Rule"). The 1983 SBZ Rule was subsequently amended in 2008. In each instance, the rulemaking process was focused on mountaintop mining in Appalachia.

47. OSMRE's rulemaking process was never intended to address subsidence from underground coal production, much less result in a *de facto* ban on longwall mining. In the more than 30 years since the 1983 SBZ Rule was adopted—a period of time encompassing multiple lawsuits, the promulgation of revisions to the SBZ rule in 2008, and the current Administration's abandonment of that rule to pursue more stringent mountaintop mining regulation—OSMRE never once suggested that it was also concerned about the impacts that *underground* mines were having on streams because of subsidence.

48. OSMRE issued an Advanced Notice of Proposed Rulemaking on November 30, 2009, for the SPR now before this Court. 74 Fed. Reg. 62,664 (Nov. 30 2009). OSMRE emphasized its commitment to "reducing the adverse impacts of Appalachian surface coal mining operations on streams." *Id.* at 62,664–66. No mention was made of the new rule applying to subsidence impacts due to underground mining. *Id.*

49. On June 18, 2010, OSMRE published a second, superseding Notice of Intent, which indicated that the purpose of preparing the draft environmental impact statement ("DEIS") for the SPR was to analyze potential revisions to the rule to "improve protection of streams from the adverse impacts of *surface coal mining operations*." 75 Fed. Reg. 34,666 (June 18, 2010) (emphasis added). Again, there was no mention of any intent to address subsidence from underground mining.

50.     It was not until OSMRE issued its proposed SPR in July 2015 that OSMRE made any mention of its intent to regulate stream impacts caused by subsidence due to underground mining.   80 Fed. Reg. 44,436 (July 27, 2015).   As set forth in paragraphs 63 to 81 below, OSMRE has now transformed a decades old process that was aimed almost exclusively against mountaintop mining into a regulation whose greatest impact will, by far, be in the effective banning of longwall mining.

## C.  Murray Energy Corporation's Efforts to Participate in the Rulemaking

51.     Having sprung its effective longwall mining ban on an unsuspecting public with its July 27, 2015 publication of the proposed rule, and despite the long and highly-technical nature of the proposed SPR—the proposed rule is 254 pages, with additional supporting technical documents—OSMRE initially provided a limited, sixty-day notice-and-comment period.   This period was later extended to October 26, 2015, despite numerous requests by industry, trade groups, and the public to extend the comment period even further to allow for sufficient time to review and comment on the proposal.   While those in the public wishing to address the effect of the proposed rule on mountaintop mining had years and even decades to prepare, those wishing to address the far-reaching impacts of the rule on longwall mining were allowed a mere 90 days.

52.     Murray Energy reviewed the technical and legal documents supporting the rulemaking and found little justification for the proposed ban on longwall mining in these documents.   Murray Energy therefore submitted to DOI a request for additional information associated with the development of the proposed rule pursuant to the Freedom of Information Act (FOIA).   Murray Energy specifically requested only those records that related to the development of the proposed rulemaking but had not been made public as part of the docket.

53.     DOI failed to comply with its FOIA regulations, which require a timely response, and Murray Energy initiated a lawsuit under the FOIA to effectuate the production of the requested documents.  *See* Compl., *Murray Energy Corp. v. U.S. Dep't of the Interior*, No. 1:15-cv-1620-RCL (D.D.C. filed Oct. 5, 2015) (assigned to the Honorable Royce C. Lamberth, Senior Judge).

54.     Murray Energy filed a motion for a preliminary injunction in the FOIA litigation in an attempt to receive some of the requested records before the comment deadline of October 26, 2015, and, subsequently, DOI agreed to immediately begin reviewing and releasing records.

55.     DOI produced some documents, but these productions have been delayed and deficient.  Whole batches of documents were not produced and the majority of documents were redacted.  Over 2,200 documents were redacted in full, comprising nearly 50,000 pages of completely redacted material.  It appears that hundreds of the produced documents may contain redacted technical or factual information and the majority of the redacted documents provide so little information, if any, that it is impossible to tell whether they could potentially contain technical or factual information.

56.     Productions have now been completed in the FOIA litigation and the parties have agreed to present to Judge Lamberth a proposed schedule for summary judgment briefing in January 2017.

57.     DOI failed to include in the public docket the technical documents it has so far released to Murray through the FOIA litigation—documents that should have been included in the record and bear directly on the proposed SPR.  For example, OSMRE contended in its proposal that its material damage restriction would have little adverse economic impact on longwall mining operations, reasoning that (a) mining occurring below certain threshold depths

in different regions of the country will not create surface subsidence and (b) there is ample longwall minable coal below these depths.  Through the FOIA productions, DOI provided a document that appears to critique this analysis and, instead, indicates that many factors other than depth will determine whether surface subsidence will occur.  These and other documents should have been included in the docket.  Their absence adversely affected the ability of Murray Energy, and the public at large, to comment on the basis of the proposed rulemaking.

58.      DOI's failure to provide the requested information had no effect on the October 26, 2015 deadline for public comments on the Proposed Rule, so Murray Energy – like many other interested stakeholders – was required to submit comments on a partial agency record.

59.      Murray Energy's comments, which were timely filed on October 26, 2015, included over 14,000 pages of analysis that outlined, in painstaking detail, the innumerable flaws and defects in OSM's proposal.  *Comments of Murray Energy Corporation on the Proposed Stream Protection Rule* (Oct. 26, 2015), Stream Protection Rule Docket ID OSM-2010-0018-10455 (Attachment Murray Energy 0002a, 0003a and 0004a).

60.      Murray Energy's comments covered the full spectrum of issues, among them, OSM's unsupported and wholly erroneous claim that the Proposed Rule would not have any adverse impact on underground longwall mining based on (a) certain assumed depth thresholds below which OSM believed subsidence would not occur, and (b) a belief that if longwall mining was adversely impacted, a mine operator could simply convert from longwall mining to room-and-pillar mining without associated cost or disruption.   In its comments, Murray Energy explained why OSM's belief was wrong, and, among other things, why it would be cost-prohibitive to convert from longwall to room-and-pillar mining.  *Id*.  For example, Murray Energy wrote:

> Using current, real-world financial data, an analysis of mining
> operations at three [Murray Energy] underground longwall mines
> demonstrates that converting to continuous (room-and-pillar)
> mining methods is cost prohibitive.  The rational business decision,
> based on accurate financial projections of the likely costs of
> longwall mining, continuous mining, or shutdown of operations,
> dictates that the three underground mines must be closed.  This
> absurd regulatory outcome forced on the industry as a result of
> OSMRE's tortured and irrational rulemaking process is entirely
> inconsistent with Congress' intent to promote longwall mining
> measures "to the extent technically and economically feasible."

*Id.*  Murray Energy provided detailed financial projections in support of this comment.  *Id.* at Ex.

A.  Nonetheless, in its final rule, OSM continues to assert that mines can simply convert from

longwall to room-and-pillar mining without cost impact or disruption.  81 Fed. Reg. at 93,081("If

it is determined that a proposed operation would have this result [i.e., material damage to the

hydrologic balance, even if temporary], the operational plan would need to be modified to

prevent subsidence of the stream. *That modification could include the use of underground mining*

*technology that prevents subsidence, such as room-and-pillar mining, for that portion of the*

*operation*.") (emphasis added).  In maintaining this position, OSM offered no reasoned response

or resolution to Murray Energy's detailed comments explaining why such a conversion in mining

methods would not be possible.  Indeed, OSM did just the opposite, blithely asserting that a mine

operator could simply convert a portion of a mining operation from one method to another.

61.     Murray Energy's comments also addressed OSM's wholesale changes to the Part

800 bonding and financial guarantee requirements in the Proposed Rule.  Those changes were

primarily directed at the financial guarantees required for long-term water discharges.  Murray

Energy explained why OSM's proposed changes were unworkable and would severely disrupt

the bonding market, preventing mine operators from obtaining the permits they need to operate,

and making it all but impossible to obtain bond release after mining is complete.  *See Comments of Murray Energy Corporation on the Proposed Stream Protection Rule* (Oct. 26, 2015), Stream Protection Rule Docket ID OSM-2010-0018-10455 (Attachment Murray Energy_0002a) at 51-71; Exhibit A (Attachment Murray Energy_0003a) at 77-79.  Murray Energy provided declarations from experts in the bonding and surety markets to further support its comments.

62.     In the Final Rule, OSM acknowledges the uncertainties associated with its new bonding and financial guarantee requirements, but then attempts to deflect Murray Energy's comments by asserting that if surety bonds are no longer available, mine operators may be able to seek collateral bonds instead.  81 Fed. Reg. at 93,243.  OSM's response overlooks the fundamental point raised by Murray Energy – that no surety company would issue a bond under the circumstances proposed by OSM, at least without requiring the operator to post 100% collateral for the bond.  This would effectively convert a surety bond requirement into a collateral bond requirement, but of critical importance (wholly ignored by OSM), *most operators will be unable to meet the collateral requirements,* thus seriously undermining their ability to mine.  OSM makes no response to this fundamental point.

**D.  Provisions of the Stream Protection Rule**

63.     The SPR will effectively ban longwall mining.  Its provisions prohibiting planned subsidence that even temporarily results in the dewatering of streams will make it impossible for longwall mining operations, such as Murray Energy's, to satisfy the requirements for permit issuance.  In numerous respects, those provisions are contrary to the text of the statute and the intent of Congress.

### 1) Subsidence Impacts

64.    In SMCRA, Congress enacted a technology-based regulatory program that would address subsidence impacts to streams but also allow underground mining to proceed when subsidence could not be avoided.  30 U.S.C. § 1266(b)(1).  Congress then expressly exempted certain mining operations from these performance standards when the mining technology incorporates planned subsidence "in a predictable and controlled manner."  *Id.*  Longwall mining is the chief mining method that produces planned subsidence "in a predictable and controlled manner."

65.    Contrary to the statutory exemption, the SPR will effectively ban longwall mining if these operations cause even *temporary* impacts to streams that could otherwise recover or be repaired in the future.  Because longwall mining by its very nature results in planned subsidence, which usually occurs over a short period of time relatively soon after removal of coal deposits, it is inevitable that longwall mining will subside streams and cause at least some temporary hydrologic impacts, such as stream dewatering.  Unlike the statute, the SPR contains no exemption for longwall mining.

66.    OSMRE has failed to explain why the prior regulatory regime does not address subsidence impacts, let alone justify the extraordinary reach of these regulations.  The administrative record supporting the rule lacks any evidence supporting the conclusion that there is a subsidence problem related to longwall mining that justifies OSMRE's extreme regulatory approach adopted here.

67.    SMCRA Sections 201(c)(2) and 304(a) limit OSMRE's authority to only those regulations that are necessary to carry out the provisions of the statute.  30 U.S.C. §§ 1211(c)(2), 1224(a).  OSMRE has an obligation to explain why it is necessary to effectively ban longwall

mining despite the evident congressional purpose of encouraging longwall mining.  OSMRE has failed to do so.

68.     OSMRE has exceeded its authority under SMCRA in promulgating its ban on longwall mining (a) by applying a statutory provision that Congress did not apply to longwall mining and (b) by effectively defining the term "permit area" in a manner that directly contradicts the statutory definition.  OSMRE applies SMCRA Section 510(b)(3), 30 U.S.C. § 1260(b)(3), to prevent issuance of permits for longwall mining that will cause material damage to the hydrologic balance outside the permit area ("MDHB"), disregarding that Congress explicitly intended to encourage longwall mining and exempted longwall mining from the statute's performance standard for subsidence.  *See* 30 U.S.C. §§ 1201(b), 1266(b)(1).  OSMRE then compounds its infidelity to the statute by applying the MDHB prohibition to areas directly overlying longwall mines despite statutory definitions making clear that such areas constitute the "permit area," and therefore cannot lie "outside the permit area" for purposes of the prohibition in Section 510(b)(3).  Finally, OSMRE applies its MDHB prohibition to temporary subsidence impacts that dewater streams even though those impacts can be reversed through restoration.

### 2)     *Material Damage to the Hydrologic Balance*

69.     Under the SPR, material damage to the hydrologic balance outside the permit area is prohibited.  81 Fed. Reg. at 93,324 (30 C.F.R. § 773.15(e)(2)).  MDHB is defined in pertinent part as:

> an adverse impact, as determined in accordance with the rest of this definition, resulting from…subsidence associated with underground mining activities, on the quality or quantity of surface water or groundwater, or on the biological condition of a perennial or intermittent stream.  The determination of whether an adverse impact constitutes [MDHB] will be based on…the following reasonably anticipated or actual effects of the operation:

(1) For a surface water located outside the permit area, effects that cause or contribute to a violation of applicable state or tribal water quality standards, including, but not limited to, state or tribal water quality standards established under section 303(c) of the Clean Water Act, 33 U.S.C. 1313(c), or, for a surface water for which water quality standards have not been established, effects that cause or contribute to non-attainment of any premining use of that surface water outside the permit area. . . .

81 Fed. Reg. 93,322 (33 C.F.R. § 701.5).

70.    In the preamble to the final SPR, OSMRE provides only a cursory explanation to justify this extraordinary prohibition.  OSMRE states that a longwall mining operation could switch from longwall mining to room-and-pillar mining for the portion of the operation lying beneath a stream.  81 Fed. Reg. at 93,081.  As Murray explained to OSMRE in its comments on the rulemaking proposal, this would be impracticable in the eastern United States, where the landscape is crisscrossed with numerous streams, and a longwall mining operation could not possibly afford the costs and delays associated with disassembling and moving the enormous longwall machine from place to place in the confines of the deep underground mine workings.

### a.   *Permit Area*

71.    The SPR prohibits material damage to the hydrologic balance outside the permit area.  81 Fed. Reg. at 93,324 (30 C.F.R. § 773.15(e)(2)).  Consequently, the extent of the "permit area" is central to determining the scope of this prohibition.

72.    The SPR effectively defines the permit area (inversely through the definition of "adjacent area") to *exclude* the area overlying the underground workings of a longwall mine plus the area within a reasonable angle of dewatering from the perimeter of the underground workings.  81 Fed. Reg. 93,322 (33 C.F.R. § 701.5).  Defining the permit area in this manner will exclude from the "permit area" those streams directly overlying the underground workings that

are expected to have planned subsidence and hydrologic impacts, causing those streams to be located "outside the permit area" and therefore subject to the MDHB prohibition.

73.     The SPR defines the "permit area" for underground mines in a manner that conflicts with the statutory definition of "permit area."  The statute defines this term as including the surface area shown on the applicant's map, which must depict "the land to be affected" by the underground mining operation.  30 U.S.C. §§ 1257(b)(9), 1291(17).  Because the SPR impermissibly defines the area overlying the mine as outside the permit area, the SPR effectively prohibits the routine occurrence of subsidence impacts from longwall mining, such as stream dewatering, in the very area where subsidence is planned to occur.

### b. *State and Tribal Water Quality Standards*

74.     The SPR's MDHB provision prohibits any adverse subsidence-related impact that causes or contributes to a violation of state or tribal water quality standards.  81 Fed. Reg. at 93,322 (33 C.F.R. § 701.5).

75.     Under this definition, any water quality standard that requires maintenance of aquatic life would be impacted if subsidence were to de-water a stream segment, depriving aquatic life of the conditions needed for survival.

76.     State and tribal water quality standards under the Clean Water Act ("CWA") consist of designated uses and criteria (either numeric or narrative) that must be attained in order to protect the designated use.  33 U.S.C. § 1313(c); 40 C.F.R. § 131.1(i).  States assign "designated uses" for their most significant bodies of water, and most States rely on a default provision for smaller streams that establishes the minimum designated uses applicable to all waters for which there is no specific designation.

77.     Each State in which Murray Energy operates its longwall mines has established such default designated use categories, which at a minimum protect aquatic life use.  Ohio Admin. Code 3745-1-07(A)(4)(a); Ill. Admin. Code tit. 35 §§ 302.101(b), 302.202; 401 Ky. Admin. Regs. 10:026; Utah Admin. Code r. 317-2-13.13, 317-2-6; W. Va. Code R. § 47-2-6.1. In these states, water bodies must, at a minimum, be maintained in a condition that is sufficient to support and maintain aquatic life.

78.     OSMRE's new definition of MDHB effectively prohibits stream-related subsidence impacts when an aquatic-life designated use under the CWA is precluded.  This is so because preclusion of such uses would violate the applicable water quality standard.  The principal hydrologic impact of subsidence is diminishment of surface water flows, including the occasional (but spatially limited) complete dewatering of streams.  Stream dewatering can result, for example, in isolated, stagnant pools of water along the streambed in which dissolved oxygen would be expected to fall below the criteria levels that are required by water quality standards and necessary to sustain aquatic life.  Particularly in the East, where streams are prevalent, a longwall mine cannot possibly meet this new standard given that subsidence is both inevitable and planned for, especially in those areas directly overlying the mine.

### c.  *Temporary Impacts*

79.     OSMRE has interpreted material damage to the hydrologic balance to include both temporary and permanent impacts. 81 Fed. Reg. at 93,081.  Any impact that would preclude a designated use, and thereby violate a state or tribal water quality standard, would constitute material damage to the hydrologic balance, regardless of the duration of the impairment.

80.     Defining material damage in this manner ensures that applicants will never be able to demonstrate that subsidence from underground longwall mining will not cause MDHB.

Some hydrologic impacts may only be temporary; however, the expanded definition of material damage will necessarily encompass these impacts. As OSMRE explained in promulgating the SPR, "Any material damage to the hydrologic balance outside the permit area is unacceptable, including damage from subsidence, even if it is temporary." *Id.*

81.     OSMRE added new provisions to the final rule purporting to address this issue. OSMRE asserts that these provisions would allow the issuance of a permit for longwall mining, even if the mining operation will result in subsidence-related impacts to streams, provided that the operator submits plans demonstrating that those impacts will be repaired sufficiently to avoid MDHB. 81 Fed. Reg. at 93,421 (30 C.F.R. § 817.34(a)(2)); *Id.* at 93,442 (30 C.F.R. § 817.121(c)). On the contrary, even with such restoration planning, these provisions will not allow the issuance of permits for longwall mining that causes stream dewatering because: (a) subsidence impacts will occur very soon following the planned collapse of the mine roof; (b) stream dewatering will occur quickly and cause or contribute to a violation of the applicable water quality standard, resulting in MDHB; (c) repair of the stream to restore flows will likely take months or years to complete in accordance with the restoration plan; and (d) OSMRE has prohibited temporary MDHB.

## VI.  CLAIMS FOR RELIEF

82.     Plaintiff realleges and incorporates by reference Paragraphs 1 through 81 of this Complaint.

83.     OSMRE's issuance of the final SPR is a final agency action which is subject to judicial review by this Court under the APA and SMCRA.

84.     By issuing the final SPR, OSMRE violated the APA and SMCRA. OSMRE's final SPR is arbitrary, capricious, an abuse of discretion, otherwise not in accordance with law

and without observance of procedure required by law pursuant to the Administrative Procedure Act.  OSMRE's final SPR is also in violation of the requirement under SMCRA that regulations be necessary.

## CLAIM I

**Violation of 30 U.S.C. § 1211(c)(2) and 30 U.S.C. § 1224(a) (Failure to Demonstrate the SPR is Necessary)**

85.     Plaintiff realleges and incorporates Paragraphs 1 through 84 of this Complaint.

86.     OSMRE failed to demonstrate that the SPR's ban on longwall mining is "necessary to carry out the purposes and provisions of [SMCRA]" in violation of 30 U.S.C. § 1211(c)(2) and 30 U.S.C. § 1224(a).

87.     SMCRA limits OSMRE's authority to prescribe rules and regulations to only those that are "necessary" to carry out SMCRA's provisions.  OSMRE has failed to explain why the prior regulatory regime does not address the subsidence impacts to which the SPR is allegedly responding.  OSMRE has failed to identify any problems or insufficiencies in the program that would justify the subsidence provisions of the SPR.

88.     For these reasons, OSMRE has failed to demonstrate that the SPR is "necessary" to carry out the purposes and provisions of SMCRA and, therefore, the SPR violates SMCRA. This Court should hold unlawful and set aside the final SPR.

## CLAIM II

**Violation of 5 U.S.C. § 706(2)(A), (C) (Promulgation of Regulation Not in Accordance with Law and in Excess of Statutory Authority)**

89.     Plaintiff realleges and incorporates Paragraphs 1 through 88 of this Complaint.

90.     The final SPR is in direct conflict with provisions of SMCRA. The final SPR characterizes the "permit area" in a manner that contradicts the definition set forth in SMCRA, with direct implications for the regulated community based on this regulatory definition. Furthermore, the final SPR will effectively ban longwall mining despite Congress's intent to preserve such operations by exempting them from performance standards for subsidence.  These and related provisions under the final SPR contravene the express language of SMCRA and Congress's intent in passing the law.

91.     For these reasons, OSMRE's SPR is not in accord with the law and amounts to an unlawful exercise of authority contrary to the statutory limits of that authority under SMCRA.  The SPR therefore violates the APA.  5 U.S.C. § 706(2)(A), (C).  This Court should accordingly hold unlawful and set aside the final SPR.

## CLAIM III

### Violation of 5 U.S.C. § 706(2)(D) (Failure to Observe Procedure Required by Law)

92.     Plaintiff realleges and incorporates Paragraphs 1 through 91 of this Complaint.

93.     The final SPR was promulgated "without observance of procedure required by law" in violation of 5 U.S.C. § 706(2)(D).  When a rule is technical in nature, the availability of technical studies and data that the agency used in reaching its decision is critical to the meaningful opportunity to comment on the proposed rulemaking that is guaranteed under the APA.  Disclosure of such technical studies and data is therefore required.

94.     Murray Energy reviewed the technical and legal documents supporting the rulemaking and found little justification for the subsidence provisions of the proposed rulemaking.  Murray Energy submitted a FOIA request to DOI for additional information associated with the rulemaking.  Through the FOIA request, Murray Energy discovered that DOI

failed to include in the public docket underlying technical documents and data upon which the Agency relied in developing the rule.  Without these underlying materials, Murray Energy and the public at large were not afforded appropriate notice and opportunity to comment on the basis of the rulemaking, as required by law.

95.     For these reasons, OSMRE's SPR is without observance of procedure required by law.  The SPR therefore violates the APA.  5 U.S.C. § 706(2)(D).  This Court should hold unlawful and set aside the final SPR.

## CLAIM IV

### Violation of 5 U.S.C. § 706(2)(A) (The Final SPR Is Arbitrary and Capricious)

96.     Plaintiff realleges and incorporates Paragraphs 1 through 95 of this Complaint.

97.     OSMRE has failed to explain, substantiate, or justify its rationale for many of the provisions in the final SPR, and the rule is accordingly arbitrary and capricious. OSMRE has expanded the definition of material damage to the hydrologic balance without justifying this regulatory overreach, failing to explain how room-and-pillar mining is a practicable substitute for longwall mining and failing to justify the inclusion of temporary impacts under the definition of material damage to the hydrologic balance.

98.     OSMRE has not cited to any demonstrative evidence to support the ban on longwall mining contained in the final SPR. The rule therefore violates the Administrative Procedure Act as being arbitrary and capricious. 5 U.S.C. § 706(2)(A).

## CLAIM V

### Violation of 5 U.S.C. § 553 (Failure to Respond to Comments)

99.     Plaintiff realleges and incorporates Paragraphs 1 through 98 of this Complaint.

100.    OSMRE failed to meaningfully review and respond to comments submitted by Murray Energy including, without limitation, comments related to mining methods and bonding requirements.

101.    OSMRE did not respond in a reasoned manner to the comments received, explain how it resolved the significant problems raised by Murray Energy, or show how that resolution led OSMRE to the final rule.

102.    For these reasons, the SPR violates the APA.  5 U.S.C. § 553.

## CLAIM VI

### Violation of the Fifth Amendment to the United States Constitution (Taking of Private Property Without Due Process or Just Compensation)

103.    Plaintiff realleges and incorporates Paragraphs 1 through 102 of this Complaint.

104.    Murray Energy has billions of tons of coal reserves that can only be economically produced using the longwall form of mining.  Given that the SPR effectively bans longwall mining, these coal reserves will now be sterilized.

105.    The rule will strand billions of dollars in Murray Energy's capital investment.

106.    These losses represent the taking of Murray Energy property without due process and without just compensation in violation of the Fifth Amendment to the United States Constitution.

## VII.  PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment providing the following relief:

107.    Order, declare, and adjudge that the Defendants have violated the APA and SMCRA in issuing the SPR;

108.    Declare that Defendants' actions, as set forth above, are arbitrary, capricious, an abuse of discretion, otherwise not in accordance with law and without observance of procedure required by law pursuant to the APA;

109.    Declare that Defendants' actions, as set forth above, are not necessary to carry out the purposes and provisions of SMCRA as required by law pursuant to SMCRA;

110.    Hold unlawful and set aside the SPR;

111.    Grant such other and further relief as may be requested hereafter by Plaintiff, or as the Court deems necessary and appropriate.

DATED:        December 22, 2016

Respectfully submitted,


HOGAN LOVELLS US LLP

*/s/ James T. Banks*
James T. Banks
(D.C. Bar No. 261156)
Justin A. Savage
(D.C. Bar No. 466345)
555 Thirteenth Street, N.W.
Washington, D.C. 20004
(202) 637-5600 (tel.)
(202) 637-5910 (fax)
james.banks@hoganlovells.com

TROUTMAN SANDERS LLP

Peter S. Glaser
(DC Bar #334714)
401 Ninth Street N.W.
Suite 1000
Washington, D.C. 20004
(202) 274-2998
Peter.glaser@troutmansanders.com

TROUTMAN SANDERS LLP

Brooks M. Smith
(Application for admission to this court
pending)
1001 Haxall Point
Suite 1500
Richmond, VA 23219
(804) 697-1414
Brooks.smith@troutmansanders.com

*Counsel for Plaintiff*
*Murray Energy Corporation*

## CERTIFICATE OF SERVICE

I hereby certify that I filed the foregoing Complaint and Petition for Review with the U.S.

District Court for the District of Columbia on December 22, 2016, via the Court's CM/ECF

system, and I will cause a true copy of the foregoing to be served via U.S. mail on the 22nd day

of December, 2016, upon the following:


Hon. Sally Jewell
Secretary of the Interior
U.S. Department of the Interior
1849 C Street, NW
Washington, DC 20240

Hon. Joseph Pizarchik
Director
Office of Surface Mining Reclamation and Enforcement
1951 Constitution Avenue, NW
Washington, DC 20240

Hon. Loretta E. Lynch
Attorney General of the United States
United States Department of Justice
950 Pennsylvania Ave., NW
Washington, DC 20530-0001

Hon. Channing D. Phillips
United States Attorney's Office
555 4th Street, NW
Washington, DC 20530


/s/ James T. Banks_____
James T. Banks
Parnter
Hogan Lovells
***Counsel for Plaintiff Murray Energy Corporation***

- 31 -